Filed 10/15/12 (lead case;  see companion cases, S176886 & S176213, also filed 10/15/12)

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                )
                )
    Plaintiff and Respondent,    )
                )            S177046
    v.              )
                )     Ct.App. 4/1 D052885
VIRGINIA HERNANDEZ LOPEZ,        )
                )     San Diego County
    Defendant and Appellant.    )  Super. Ct. No. SCE274145
_____)

The Sixth Amendment of the United States Constitution grants a criminal defendant the right to confront adverse witnesses.  That right is at issue in a trio of cases before us.  (The two companion cases are *People v. Dungo* (Oct. 15, 2012, S176886) ___ Cal.4th ___, and *People v. Rutterschmidt* (Oct. 15, 2012, S176213) ___ Cal.4th ___.)  Each involves the constitutionality of a prosecution expert's testimony about certain information in a report prepared by someone who did not testify at trial.

Here, defendant Virginia Hernandez Lopez was charged with vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b)), after her vehicle collided with another, killing its driver.  To prove intoxication, the prosecution at trial introduced into evidence a laboratory analyst's report on the percentage of alcohol in a blood sample taken from defendant two hours after the accident.  The analyst did not testify, but a colleague did.  A jury found defendant guilty as charged.  The Court of Appeal reversed, holding that admission of the

nontestifying analyst's laboratory report and the colleague's testimony relating some of the report's contents violated defendant's right to confront and cross-examine the report's author. Because we disagree with that holding, we reverse the Court of Appeal.

## I

### A. Prosecution's Evidence at Trial

On the evening of August 18, 2007, defendant was working at a restaurant in Julian, San Diego County. Three times that evening, the restaurant's bartenders served defendant single shots of tequila: the first at 8:30 p.m. (during her work shift), the other two between 9:45 p.m. (when her shift ended) and 10:15 p.m. Shortly before 11:00 p.m., defendant left in her sport utility vehicle (SUV). On a narrow, curving road, the SUV struck the driver's side of a pickup truck traveling in the opposite direction, killing the driver, Allan Wolowsky. Defendant was seriously injured; while being airlifted to a hospital, she told an emergency medical technician that she had "a couple of drinks" at work, that she had been driving "really fast," and that she had lost control of her SUV. At the hospital, at 1:04 a.m. (approximately two hours after the accident), two vials of blood were drawn from defendant for testing.

At defendant's jury trial, criminalist John Willey of the San Diego County Sheriff's Regional Crime Laboratory testified that he had reviewed a laboratory report by his colleague, Jorge Peña, who had analyzed defendant's blood sample. (As noted earlier, Peña did not testify; the prosecution did not assert that Peña was unavailable as a witness.) Willey mentioned that, as described in Peña's report, Peña had used a gas chromatograph to analyze defendant's blood sample. The report, Willey testified, stated that defendant's blood sample contained a blood-

alcohol concentration of 0.09 percent.**1**  Willey added that based on his own "separate abilities as a criminal analyst," he too concluded that the blood-alcohol concentration in defendant's blood sample was 0.09 percent.

Willey had been in the laboratory's employ for more than 17 years and knew its "procedures for processing blood samples for alcohol analysis."  Willey explained that he had trained Peña and was "intimately familiar with [Peña's] procedures and how [Peña] tests [blood for] alcohol," and that "each of the people who work[] at the lab is trained to process blood alcohol analysis in the same manner."  At the prosecution's request, the trial court admitted into evidence a copy of Peña's laboratory report.  Defendant objected to the report's admission as well as to Willey's testimony about its contents.

Toxicologist John Treuting testified that a person with a blood-alcohol level of 0.09 percent two hours after a collision who had consumed no alcohol during those two hours would at the time of the accident have been intoxicated (see p. 3, fn. 1, *ante*), with a blood-alcohol level of 0.12 percent.  Treuting said that if, as the restaurant's bartenders testified, defendant had only a *single* shot of tequila about three-and-a-half hours before the accident and two more *single* shots of tequila

---

**1**　　Vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b)), the crime with which defendant was charged, occurs when a defendant commits an act of vehicular manslaughter while "driving . . . in violation of Section 23140, 23152, or 23153 of the Vehicle Code . . . ."  (*Ibid.*)  Under these Vehicle Code provisions, the prosecution may prove intoxication by showing that the defendant's blood-alcohol level was 0.08 percent or greater at the time of the accident (see Veh. Code, § 23152, subd. (b); *id.*, § 23153, subd. (b)); or, if the defendant's blood-alcohol level was *lower* than 0.08 percent, by showing that the alcohol made the defendant unable to "drive . . . with the caution of a sober person, using ordinary care, under similar circumstances."  (CALCRIM No. 2110; see Veh. Code, § 23152, subd. (a); *id.*, § 23153, subd. (a); *People v. Schoonover* (1970) 5 Cal.App.3d 101, 105-107.)

between 45 and 90 minutes before the accident, defendant's blood-alcohol level should have been only around 0.04 percent. Treuting added that the 0.12 percent level might have been achieved if defendant had *double* shots of tequila instead of the single shots to which the bartenders testified.

Two California Highway Patrol officers who had investigated the fatal collision testified about its cause: After defendant had veered onto the right-hand shoulder of the narrow road, she "overcorrected" and drove into the oncoming lane, colliding with Wolowsky's pickup truck.

Accident reconstruction expert Ernest Phillips testified that defendant had been driving between 68 and 75 miles per hour, and that after drifting onto the right shoulder of the road, she steered to the left into oncoming traffic, causing the collision. Phillips attributed the accident to defendant's speed, intoxication, and inattention.

### B. Defense Evidence at Trial

Defendant testified that after finishing her work shift at the restaurant on the night of the accident, she and coworker Jorge Acosta each had two shots of tequila at the restaurant. Thereafter, defendant said, she left in her car, driving between 50 and 55 miles per hour; after rounding a curve, she saw a car's high-beam lights approaching her in her lane; she became scared and steered a little to the right; she could not remember what happened after that. Coworker Acosta corroborated defendant's testimony about drinking only two shots of tequila. Accident reconstruction expert Stephen Plourd agreed with defendant about the speed of her SUV at the time of the fatal collision. Dr. Ian McIntyre, the manager of the San Diego County Medical Examiner's forensic toxicology laboratory, testified that at the time of the accident Wolowsky, the driver of the other car, was intoxicated, with a blood-alcohol level of 0.11 percent.

4

## C. Verdict and Appeal

The jury convicted defendant of vehicular manslaughter while intoxicated, as charged, and the trial court sentenced her to two years in prison. The Court of Appeal affirmed the trial court's judgment. Thereafter, we granted defendant's petition for review and ordered the case transferred to the Court of Appeal for reconsideration in light of *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), which the United States Supreme Court had decided six weeks after the Court of Appeal's decision. On reconsideration, the Court of Appeal reversed the judgment of conviction; it held that admitting nontestifying analyst Peña's laboratory report into evidence and permitting criminalist Willey to testify about the report's contents violated defendant's right to confront Peña at trial. We granted the Attorney General's petition for review.

## II

As we stated earlier, the Sixth Amendment to the federal Constitution gives a criminal defendant the right to confront and cross-examine adverse witnesses. In *Ohio v. Roberts* (1980) 448 U.S. 56, 66, the United States Supreme Court construed that right as allowing the admission at trial of an out-of-court statement if it fell within a "firmly rooted hearsay exception" or had "particularized guarantees of trustworthiness." The high court overruled that decision 24 years later, in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). There, the court created a general rule that the prosecution may not rely on "testimonial" out-of-court statements unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*Id.* at p. 59.)

Although the high court in *Crawford* did not define the term "testimonial," it made these observations: "[T]he Confrontation Clause . . . applies to 'witnesses' against the accused — in other words, those who 'bear testimony.' [Citation.] 'Testimony,' in turn is typically '[a] solemn declaration or affirmation made for

5

the purpose of establishing or proving some fact.' [Citation.]  An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. . . .  [¶]  Various formulations of this core class of 'testimonial' statements exist:  '*ex parte* in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]." (*Crawford*, *supra*, 541 U.S. at pp. 51-52.)  Some three years later, in *People v. Geier* (2007) 41 Cal.4th 555 (*Geier*), we addressed the *Crawford* holding.

In *Geier*, a laboratory director — relying on a laboratory report prepared by a nontestifying analyst — testified at the defendant's trial that DNA found on vaginal swabs taken from the murdered rape victim matched the defendant's DNA.  We unanimously rejected the defendant's argument that the report was testimonial.  We said:  "[A] statement is testimonial if (1) it is made . . . by or to a law enforcement agent and (2) describes a past fact related to criminal activity for (3) possible use at a later trial.  Conversely, a statement that does not meet all three criteria is not testimonial." (*Geier*, *supra*, 41 Cal.4th at p. 605.)  Under that test, *Geier* concluded, the report of the nontestifying laboratory analyst was not testimonial and thus admissible, because it was "a contemporaneous recordation of observable events rather than the documentation of past events" related to criminal activity.  (*Ibid*.)

6

Since then, the high court has in three cases applied its *Crawford* holding — that "[t]estimonial statements of witnesses absent from trial" are ordinarily admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine" (*Crawford*, *supra*, 541 U.S. at p. 59) — to documents reporting the laboratory findings of nontestifying analysts. Those post-*Crawford* cases are *Melendez-Diaz*, *supra*, 557 U.S. 305; *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705] (*Bullcoming*); and *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221] (*Williams*).

In *Melendez-Diaz*, the defendant was charged in Massachusetts with cocaine distribution and trafficking. As permitted under Massachusetts law, the prosecution introduced into evidence three " 'certificates of analysis' " (*Melendez-Diaz*, *supra*, 557 U.S. at p. 308), each prepared by a laboratory analyst and sworn before a notary public; these laboratory certificates stated that a substance found in plastic bags in the defendant's car was determined to be cocaine. The defendant was convicted of the charges. A Massachusetts appellate court held that the trial court's admission of the certificates did not violate the defendant's right to confront and cross-examine the nontestifying laboratory analysts who had done the testing; the Supreme Judicial Court of Massachusetts denied review. (*Id.* at p. 309.)

Thereafter, in a five-to-four decision, the United States Supreme Court held that the laboratory certificates in *Melendez-Diaz* fell "within the 'core class of testimonial statements' " (*Melendez-Diaz*, *supra*, 557 U.S. at p. 310), and thus were inadmissible under *Crawford*, *supra*, 41 U.S. 36. The court observed that each certificate was (1) "a ' "solemn declaration or affirmation made for the purpose of establishing or proving some fact" ' " (*Melendez-Diaz*, *supra*, at p. 310), (2) "functionally identical to live, in-court testimony" (*id.* at pp. 310-311), (3) " ' "made under circumstances which would lead an objective witness

7

reasonably to believe that [it] would be available for use at a later trial" ' " (*id*. at p. 311), and (4) created "to provide 'prima facie evidence of the composition, quality, and the net weight' " (*ibid*.) of the substance found in the plastic bags seized from the defendant's car.

Justice Thomas, who signed the majority opinion in *Melendez-Diaz*, wrote separately to express his view that " 'the Confrontation Clause is implicated by extrajudicial statements *only insofar as they are contained in formalized testimonial materials,* such as affidavits, depositions, prior testimony, or confessions.' " (*Melendez-Diaz*, *supra*, 557 U.S. at p. 329 (conc. opn. of Thomas, J.), italics added.) Because the laboratory certificates at issue were affidavits, Justice Thomas concluded, their use against the defendant violated his confrontation right. (*Id.* at p. 330.)

Two years later, in 2011, the high court decided *Bullcoming*, *supra*, 564 U.S. ___ [131 S.Ct. 2705]. In that case, a New Mexico defendant was charged with driving while intoxicated. As permitted under New Mexico law, the prosecution introduced at trial a laboratory analyst's certificate stating that a blood sample taken from the defendant shortly after his arrest contained an illegally high level of alcohol. That analyst did not testify. Instead, the prosecution called as a witness another analyst who had "neither participated in nor observed the testing." (*Id.* at p. ___ [131 S.Ct. at p. 2709].) The New Mexico Supreme Court affirmed the judgment of conviction, holding that the admission at trial of the nontestifying analyst's laboratory certificate did not violate the defendant's confrontation right.

The United States Supreme Court in *Bullcoming* disagreed, in a five-to-four decision. It noted that, unlike the laboratory certificates at issue in *Melendez-Diaz*, *supra*, 557 U.S. 305, the analyst who prepared the certificate admitted in *Bullcoming* did not swear before a notary public that its contents were true. Nevertheless, the court said, the certificate was " 'formalized' in a signed

8

document" that made reference to New Mexico court rules providing "for the admission of certified blood-alcohol analyses." (*Bullcoming*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2717].) These "formalities" (*ibid.*) were, in the court's view "more than adequate" (*ibid.*) to qualify the laboratory certificate in *Bullcoming* as testimonial, and hence inadmissible. The high court in *Bullcoming* concluded: "Because the New Mexico Supreme Court permitted the testimonial statement of one witness [the laboratory analyst who tested the defendant's blood sample] through the in-court testimony of a second person [the expert familiar with the laboratory's testing procedures] we reverse that court's judgment." (*Id.* at p. ___ [131 S.Ct. at p. 2713].)

Then, last June, came the high court's decision in *Williams*, *supra*, 567 U.S. ___ [132 S.Ct. 2221]. In *Williams*, a Chicago woman was kidnapped, robbed, and raped. Vaginal swabs taken from the woman were sent to the Illinois State Police (ISP) Crime Laboratory; semen was found on the swabs, which were then sent to the Cellmark Diagnostic Laboratory in the State of Maryland. At the defendant's trial (before a judge, not a jury), ISP forensic biologist Sandra Lambatos, the prosecution's expert witness, testified that Cellmark analysts had tested the vaginal swabs, derived a DNA profile of the man whose semen was on the swabs, and sent ISP a laboratory report containing that profile. In the expert's opinion, the Cellmark DNA profile matched the ISP's DNA profile, which had been derived from a blood sample taken from the defendant when he was arrested for an unrelated offense. At trial, the Cellmark laboratory report was not introduced into evidence, and no Cellmark analyst testified. The defendant was convicted. The Illinois Appellate Court and the Illinois Supreme Court affirmed the judgment. Both courts stated that the prosecution expert's testimony about the Cellmark report was not offered for the truth of the matter asserted in the report, but only to

9

explain the basis of the expert's opinion finding a match between the ISP laboratory's DNA profile and the Cellmark laboratory's DNA profile.

In *Williams*, *supra*, 567 U.S. ___ [132 S.Ct. 2221], four justices of the United States Supreme Court found common grounds for the conclusion that the expert's testimony did not violate the Sixth Amendment's confrontation right, one justice wrote separately expressing agreement with that conclusion but for very different reasons, and four justices through a single dissenting opinion concluded that defendant's confrontation right was violated. Below is a summary of the various views.

Justice Alito wrote a plurality opinion that was signed by Chief Justice Roberts as well as Justices Kennedy and Breyer; in a separate concurring opinion Justice Breyer explained why he joined Justice Alito's opinion "in full" (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2252] (conc. opn. of Breyer, J.)). The plurality opinion observed: "Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause. Applying this rule to the present case, we conclude that the expert's testimony did not violate the Sixth Amendment." (*Id.* at p. ___ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).) Alternatively, Justice Alito's plurality opinion stated, even if the expert's testimony had been admitted for the truth of the matter asserted in the Cellmark laboratory's report, the report was not testimonial (and hence the expert's testimony about the report was admissible) because it was not prepared "for the primary purpose of accusing a targeted individual." (*Id.* at p. ___ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.).) Indeed, the plurality noted, the defendant was not yet a suspect at the time the report was produced. (*Ibid.*)

In a separate opinion, Justice Thomas concurred in the plurality's conclusion that no violation of the defendant's confrontation right occurred, but he

10

used different reasoning, which no other justice endorsed. Unlike Justice Alito's plurality opinion, Justice Thomas perceived "no plausible reason for the introduction of Cellmark's statements other than to establish their truth." (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2256] (conc. opn. of Thomas, J.).) Justice Thomas also rejected the plurality's reasoning that the Cellmark laboratory's report was not testimonial because it was prepared mainly to find a yet-unidentified rapist. That rationale, Justice Thomas said, "lacks any grounding in constitutional text, in history, or in logic." (*Id.* at p. ___ [132 S.Ct. at p. 2262].) Although Justice Thomas agreed with the plurality that the Cellmark report was not testimonial, he reached that conclusion by a completely different route. In his words: "I agree with the plurality that the disclosure of Cellmark's out-of-court statements through the expert testimony of Sandra Lambatos did not violate the Confrontation Clause . . . *solely* because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered ' "testimonial" ' for purposes of the Confrontation Clause." (*Id.* at p. ___ [132 S.Ct. at p. 2255] (conc. opn. of Thomas, J.), italics added.)

Justice Kagan's dissenting opinion, which was signed by Justices Scalia, Ginsburg, and Sotomayor, took the view that ISP biologist Lambatos's testimony about the Cellmark laboratory's report containing the DNA profile resulted in a violation of the defendant's right to confront the Cellmark analysts who had produced the report. Like Justice Thomas in his concurrence, the dissent rejected the *Williams* plurality's conclusion that Lambatos's testimony about the report was not admitted for the truth of the matters asserted in the report. (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2268] (dis. opn. of Kagan, J.) ["Lambatos's statements about Cellmark's report went to its truth"].) And like Justice Thomas the dissent rejected the plurality's alternative conclusion that the Cellmark laboratory report was not testimonial because it was primarily prepared not to

11

accuse a targeted suspect but to catch an unidentified rapist still at large. The dissent echoed Justice Thomas's criticism of the plurality's reasoning as devoid of support in either the text or the history of the Sixth Amendment's confrontation right. (*Id.* at p. ___ [132 S.Ct. at p. 2274] (dis. opn. of Kagan, J.).) But the dissent then criticized Justice Thomas for concluding that the Cellmark laboratory report was not testimonial because, as Justice Thomas stated, it was neither a sworn nor a certified declaration of fact. That view, the dissent stated, "grants constitutional significance to minutia, in a way that can only undermine the Confrontation Clause's protections." (*Id.* at p. ___ [132 S.Ct. at p. 2276] (dis. opn. of Kagan, J.).)

## III

As noted in the preceding part, the United States Supreme Court has said that generally the Sixth Amendment's confrontation right bars the admission at trial of a testimonial out-of-court statement against a criminal defendant unless the maker of the statement is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination. (See p. 5, *ante*.) Here, declarant Jorge Peña, whose laboratory report on the concentration of alcohol in defendant's blood two hours after the fatal accident was introduced into evidence by the prosecution, was not unavailable as a witness and defendant had no previous opportunity to cross-examine him. Was Peña's laboratory report testimonial and thus inadmissible? We explore that issue below.

Under this court's 2007 decision in *Geier*, which considered the United States Supreme Court's 2004 decision in *Crawford*, *supra*, 541 U.S. 36 (see p. 7, *ante*), here nontestifying analyst Peña's laboratory report would *not* be testimonial, and hence would be admissible at trial, because the report was a "contemporaneous recordation of observable events" (*Geier*, *supra*, 41 Cal.4th at p. 606) rather than a description of "a past fact related to criminal activity" (*id.* at

p. 605). But two years later the high court in *Melendez-Diaz* said that a laboratory report may be testimonial, and thus inadmissible, even if it " 'contains near-contemporaneous observations of [a scientific] test' " (*Melendez-Diaz, supra*, 557 U.S. at p. 315; see also *Bullcoming, supra*, 564 U.S. at p. ___ [131 S.Ct. at pp. 2714-2715]).

To resolve the difficult issue here, we look to the United State's Supreme Court's 2004 decision in *Crawford*; the 2009 decision in *Melendez-Diaz, supra*, 557 U.S. 305; the 2011 decision in *Bullcoming, supra*, 564 U.S. ___ [131 S.Ct. 2705]; and this year's decision in *Williams, supra*, 567 U.S. ___ [132 S.Ct. 2221]. Under this quartet of cases, which we summarized in the preceding part, the prosecution's use at trial of testimonial out-of-court statements ordinarily violates the defendant's right to confront the maker of the statements unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination. Although the high court has not agreed on a definition of "testimonial," a review of the just-mentioned four decisions indicates that a statement is testimonial when two critical components are present.

First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity. (See *Crawford, supra*, 541 U.S. at p. 51 ["An accuser who makes a formal statement to government officers bears testimony"]; *Melendez-Diaz, supra*, 557 U.S. at p. 310 [stressing that each of the laboratory certificates determined to be testimonial was "a ' "solemn declaration or affirmation" ' "]; *Bullcoming, supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2717] [the laboratory certificate found to be testimonial was " 'formalized' in a signed document . . . referring to . . . rules" that made the document admissible in court]; see also *Davis v. Washington* (2006) 547 U.S. 813, 830, fn. 5 ["formality is indeed essential to testimonial utterance"].) The degree of formality required, however, remains a subject of dispute in the United States Supreme Court. (See, e.g.,

13

*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.) [laboratory report lacked formality because it was "neither a sworn nor a certified declaration of fact"]; *id.* at p. ___ [132 S.Ct. at p. 2276] (dis. opn. of Kagan, J.) [rejecting Justice Thomas's view of formality as granting "constitutional significance to minutia"].)

Second, all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement's primary purpose must be. For instance, in this year's *Williams* decision, Justice Alito's plurality opinion said that the Cellmark laboratory's report at issue was not testimonial because it had not been prepared "for the primary purpose of *accusing a targeted individual*" (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.), italics added). Justice Thomas's concurring opinion criticized that standard, describing it as lacking "any grounding in constitutional text, in history, or in logic." (*Id.* at p. ___ [132 S.Ct. at p. 2262] (conc. opn. of Thomas, J.).) Instead, for Justice Thomas, the pertinent inquiry is whether the statement was "primarily intend[ed] to establish some fact with the understanding that [the] statement may be used in a criminal prosecution." (*Id.* at p. ___ [132 S.Ct. at p. 2261] (conc. opn. of Thomas, J.).) And under the *Williams* dissent, the pertinent inquiry is whether the report was prepared "for the primary purpose of establishing 'past events potentially relevant to later criminal prosecution' — in other words, for the purpose of providing evidence." (*Id.* at p. ___ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.) [joined by Justices Scalia, Ginsburg, and Sotomayor].)

Here, we need not consider the primary purpose of nontestifying analyst Peña's laboratory report on the concentration of alcohol in defendant's blood because, as explained below, the critical portions of that report were not made with the requisite degree of formality or solemnity to be considered testimonial (see p. 13, *ante*).

14

Peña's laboratory report consists of six pages. The first page, described by testifying analyst John Willey as a "chain of custody log sheet," is a chart showing the results of nine blood samples that Peña tested on August 31, 2007. One of the nine was defendant's blood sample, which was given laboratory No. 070-7737. (We describe the report's first page in greater detail below.) The report's second page is a printout of a gas chromatography machine's calibrations on the day of the test. Pages 3 and 6 of the report were described in Willey's trial testimony as "quality control [runs] before and after the subject samples." Pages 4 and 5 of the report show two computer-generated numerical results (.0906 and .0908) of two laboratory analyses of blood sample No. 070-7737 (defendant's blood sample).

Turning first to the laboratory report's pages 2 through 6, they consist entirely of data generated by a gas chromatography machine to measure calibrations, quality control, and the concentration of alcohol in a blood sample. Even though nontestifying analyst Peña's signature appears on the laboratory report's second page (the printout of the machine's calibrations) and the remaining pages bear the handwritten initials "JRP" (presumably Jorge Peña's initials), no statement by Peña, express or implied, appears on any of those pages.

Not yet considered by the United States Supreme Court is whether the prosecution's use at trial of a machine printout violates a defendant's right to confront and cross-examine the machine's operator when, as here, the printout contains no statement from the operator attesting to the validity of the data shown. We agree with those federal appellate courts that have upheld the use of such printouts. (See *U.S. v. Moon* (7th Cir. 2008) 512 F.3d 359, 362 ["the instruments' readouts are not 'statements,' so it does not matter whether they are 'testimonial' "]; *U.S. v. Washington* (4th Cir. 2007) 498 F.3d 225, 231 ["the raw data generated by the machines do not constitute 'statements,' and the machines are not 'declarants' "]; see also *Bullcoming*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2722] (conc. opn. of Sotomayor, J.) [the

15

prosecution's introduction only of "machine-generated results, such as a printout from a gas chromatograph," may not violate the defendant's confrontation right].)  Because, unlike a person, a machine cannot be cross-examined, here the prosecution's introduction into evidence of the machine-generated printouts shown in pages two through six of nontestifying analyst Peña's laboratory report did not implicate the Sixth Amendment's right to confrontation.

A more difficult question is posed by the report's first page, which is a chart containing certain information by the testing analyst.  Filled in by hand is information pertaining to "Booking #," "Lab Number," "Sample Sealed," "Subject's Name," and "Arresting Officer," for nine blood samples drawn from nine different individuals and tested on the same day by the same analyst.  As to all nine individuals, analyst Willey testified, this information was filled in by laboratory assistant Brian Constantino, whose initials appear at the top of the page under the heading "Logged By."  Included in the information written by Constantino are defendant's name, the laboratory number (No. 070-7737) given to defendant's blood sample, the date and time the sample was collected, and the date and time the sample was received at the laboratory.  Peña's initials appear in the box bearing the heading "Ana[lyzed] By."  The chart further shows the date the blood was analyzed and the results of the blood analysis (0.09), indicating that defendant's blood sample had a blood-alcohol concentration of .09 percent.  This information appears to have been entered by analyst Peña.

Of significance here is the indication on page 1 of nontestifying analyst Peña's laboratory report that defendant's blood sample was labeled with laboratory No. 070-7737, which was entered by laboratory assistant Constantino.  Based on that labeling and the machine-generated results for blood sample No. 070-7737, prosecution expert witness Willey gave his independent opinion — reflecting his "separate abilities as a criminal analyst" — that defendant's blood

16

sample contained .09 percent alcohol. It is undisputed that Constantino's notation linking defendant's name to blood sample No. 070-7737 was admitted for its truth. (Compare *Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. 2221], in which the plurality opinion, Justice Thomas's concurring opinion, and the dissenting opinion disagreed on whether the pertinent evidence was admitted for its truth.) Thus, the critical question here is whether that notation is testimonial hearsay and hence could not be used by the prosecution at trial.

The notation in question does not meet the high court's requirement that to be testimonial the out-of-court statement must have been made with formality or solemnity. (*See Davis v. Washington*, *supra*, 547 U.S. at p. 830, fn. 5 ["formality is indeed essential to testimonial utterances"]; *Melendez-Diaz*, *supra*, 557 U.S. at p. 310 [stressing that each of the laboratory certificates determined to be testimonial was "a ' "solemn declaration or affirmation" ' "]; *Bullcoming*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2717] [the laboratory certificate found to be testimonial was " 'formalized' in a signed document . . . referring to . . . rules" that made the document admissible in court].) Although here laboratory analyst Peña's initials appear on the same line that shows defendant's name and laboratory assistant Constantino's initials appear at the top of the page to indicate that he entered the notation that defendant's blood sample was given laboratory No. 070-7737, neither Constantino nor Peña signed, certified, or swore to the truth of the contents of page one of the report. The chart shows only numbers, abbreviations, and one-word entries under specified headings. Thus, the notation on the chart linking defendant's name to blood sample 070-7737 is nothing more than an informal record of data for internal purposes, as is indicated by the small printed statement near the top of the chart: "FOR LAB USE ONLY." Such a notation, in our view, is not prepared with the formality required by the high court for testimonial statements.

Defendant argues that nontestifying analyst Peña's laboratory report is indistinguishable from the laboratory certificates that the high court determined to

17

be testimonial in *Melendez-Diaz* and *Bullcoming*. Not so. In *Melendez-Diaz,* "the certificates were sworn to before a notary" by the testing analysts who had prepared the certificates. (*Melendez-Diaz, supra*, 557 U.S. at p. 309.) And in *Bullcoming*, the laboratory analyst's certificate regarding the result of his analysis was " 'formalized' in a signed document" that expressly referred to court rules providing for the admissibility of such certificates in court. (*Bullcoming*, *supra*, 131 S.Ct. at p. 2717.) Such formality is lacking here.

Defendant contends that Peña's laboratory report is testimonial under the reasoning of the *dissenting* opinion in *Williams*, *supra*, 567 U.S. ___ [132 S.Ct. 2221] (dis. opn. of Kagan, J.). This may well be true, but dissenting opinions are not binding precedent. (*U.S. v. Ameline* (9th Cir. 2005) 409 F.3d 1073, 1083, fn. 5; *Purcell v. BankAtlantic Financial Corp.* (11th Cir. 1996) 85 F.3d 1508, 1513.)

Because of our conclusion that the notation in nontestifying analyst Peña's laboratory report linking defendant's name to blood sample No. 070-7737 was not testimonial in nature, the trial court here was correct in overruling defendant's objection to that portion of the report, in permitting the prosecution to introduce that portion of the report into evidence, and in permitting expert Willey to testify regarding it. In holding to the contrary, the Court of Appeal erred. To the extent that any other notations on the first page of the chart could be considered testimonial, their admission was harmless " 'beyond a reasonable doubt' " (*People v. Geier*, *supra*, 41 Cal.4th at p. 608 [beyond a reasonable doubt standard of error applies to violations of 6th Amend. confrontation right]), in light of prosecution witness Willey's independent opinion (see p. 3, *ante*) that defendant's blood sample contained a blood-alcohol concentration of .09 percent.

**DISPOSITION**

We reverse the judgment of the Court of Appeal.


                                                KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.

19

**CONCURRING OPINION BY WERDEGAR, J.**

I agree with the majority that a laboratory assistant's logsheet notation recording the identification number assigned to defendant's blood sample was not made with sufficient formality or solemnity to be deemed a testimonial statement under *Crawford v. Washington* (2004) 541 U.S. 36 and its progeny. (Maj. opn., *ante*, at p. 17.) I also agree with Justice Corrigan the notation was not made with a primary purpose of creating evidence for trial but was, rather, made for the administration of the laboratory's own affairs, the notation of an identification number being the most rudimentary step in a laboratory routine, one that would be required no matter what use is anticipated for the ultimate analytic results. (Conc. opn. of Corrigan, J., *post*, at pp. 3-4.)

In dissent, Justice Liu argues essentially that *every* record made by a laboratory in the course of a forensic analysis is testimonial because a forensic laboratory's procedures are regulated by state law and the laboratory's ultimate purpose of creating criminal evidence permeates every step in a forensic analysis. (Dis. opn. of Liu, J., *post*, at pp. 14-15, 18.) While the United States Supreme Court decisions the dissent cites have involved the use at trial of a *nontestifying* analyst's results and thus did not squarely address the question, presented here, of whether procedural notations can form the basis of a *testifying* expert's opinion, certain passages in those decisions can be read to support the dissent's analysis.

1

(See *Bullcoming v. New Mexico* (2011) 564 U.S. \_\_\_, \_\_\_ [131 S.Ct. 2705, 2714]; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 321.)

I submit the high court's decisions should *not* be read in this manner; instead, we should continue the search for a workable rule that does not render it a constitutional violation whenever the prosecution fails to call to the stand everyone "whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device." (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at p. 311, fn. 1.) Like Justice Breyer, I seek a fair and practical "*Crawford* boundary," that is, a "logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call *all* of the laboratory experts who did so." (*Williams v. Illinois* (2012) 567 U.S. \_\_\_, \_\_\_, \_\_\_ [132 S.Ct. 2221, 2246, 2248] (conc. opn. of Breyer, J.).)

The laboratory assistant's identifying notation here, in my view, lies beyond such a fair and practical boundary for applying the confrontation clause. Certainly the recording of an identifying notation, even in a county crime laboratory, raises none of the risk of fabrication or biased reporting that flows from police or prosecutorial interrogation; in that respect, the notation here bears no resemblance to the products of ex parte examinations, the use of which at trial was the principal evil at which the confrontation clause was aimed. (See dis. opn. of Liu, J., *post*, at pp. 7-8.) Of course, unintentional errors can occur in recording an identifying number. But all record keeping by human hand is subject to such error. Unless business and public records generally are to be considered testimonial — which the high court has expressly said they are not (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at p. 324; *Crawford v. Washington*, *supra*, 541 U.S. at p. 56) — the possibility of mistakes in record keeping, alone, cannot be sufficient to render a statement testimonial. No reason appears to assume any

2

greater risk of inadvertent error is present in a county crime laboratory than in other businesses or public offices.

Nor is much likely to be gained by requiring that in all cases the employee who records a laboratory identification number be called to the stand. Such an employee presumably makes scores or hundreds of such notations annually and is extremely unlikely to recall any particular one. For the notation to be admissible under state law, the procedures by which it was made must be established and must indicate its trustworthiness. (See Evid. Code, §§ 1271, 1280.) Here that was accomplished through the testimony of a supervising forensic analyst with long experience and full knowledge of the laboratory's procedures. In the absence of anything dubious about an identifying notation, a cross-examiner would have no starting point to question its accuracy. (See *Williams v. Illinois*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2250] (conc. opn. of Breyer, J.).) No significant benefit appears that would justify the expense of trial and witness time involved in requiring live witnesses on all such identifying notations.

The demands of the confrontation clause were properly satisfied in this case by calling a well-qualified expert witness to the stand, available for cross-examination, who could testify to the means by which the critical instrument-generated data was produced and could interpret those data for the jury, giving his own, independent opinion as to the level of alcohol in defendant's blood sample.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**CHIN, J.**

3

**CONCURRING OPINION BY CORRIGAN, J.**


I fully concur in the majority's result. However, in concluding that the report of analyst Jorge Peña is not testimonial, I would take a different approach. Rather than focus on the formality issue to resolve this case, I would ground the analysis in the primary purpose prong. Applying that prong, I conclude that most of the annotations in Peña's report qualify as conventional business records. As we explain more fully below, the annotations are not testimonial hearsay under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and its progeny.

In *Crawford*, the majority observed that, at common law, "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial -- for example, business records . . . ." (*Crawford*, *supra*, 541 U.S. at p. 56.) Justice Scalia, writing for the majority, did not further explain that characterization. However, subsequent authority elucidates why, in most cases, that observation is accurate.

As the majority here explains, to qualify as testimonial a statement must be both sufficiently formal and made for a specific primary purpose. (Maj. opn., *ante*, at pp. 13-14.) The majority additionally points out that consensus has yet to emerge among the high court justices on how, precisely, the primary purpose is to

be defined.  (*Id*. at p. 14.)  Even in the face of that ambiguity, the majority of notations in Peña's report were simple, nontestimonial business records.**1**

In *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), Justice Scalia, writing for the majority, made the point that not all documents produced by a business fall within the business records exception.  He cited *Palmer v. Hoffman* (1943) 318 U.S. 109 (*Palmer*) as a case that makes this distinction clear.  In *Palmer*, a railroad employee wrote an accident report as part of his job.  Justice Scalia noted that the accident report "did not qualify as a business record because, although kept in the regular course of the railroad's operations, it was 'calculated for use essentially in the court, not in the business.' [Citation.]"  *Melendez-Diaz, supra*, 557 U.S. at p. 321.)**2**

---

**1**  Analyst Peña worked in the San Diego Sheriff's Department crime laboratory.  Evidence Code section 1270 defines "a business" as including governmental activity.  Evidence Code section 1271 states a writing is not inadmissible under the hearsay rule if:  "(a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

**2**  In making this point, Justice Scalia noted that documents kept in the regular course of business may ordinarily be admitted under the business records hearsay exception, but "not . . .  if the regularly conducted business activity is the production of evidence for use at trial." (*Melendez-Diaz, supra*, 557 U.S. at p. 321.)  This sentence should not be read to mean that if the nature of the business is producing forensic evidence, as in the case of a testing laboratory, none of its records can ever qualify as a business record.  Close reading of *Melendez-Diaz* reveals this to be a misinterpretation.  In relying on *Palmer, supra*, 318 U.S. 109, Justice Scalia drew a distinction between those routine documents and notations created as part of the business's direct operations, as opposed to documents written for the external purpose of defending a court case.  Although the *Palmer* litigation report was written to serve the business's *interest*, it was not the kind of routine document encompassed by the business records exception.  It was not a document created as part of the day-to-day running of the railroad.  The

*(Footnote continued on next page.)*

The *Melendez-Diaz* majority contrasted the railroad accident report in *Palmer*, *supra*, 318 U.S. 109, with records "prepared for the administration of an entity's affairs, and not for use in litigation," citing as examples cases involving admission of a ship's muster book, a vestry book, and a prison logbook. (*Melendez-Diaz*, *supra*, 557 U.S. at p. 321, fn. 7.)

The *Melendez-Diaz* majority explained that "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial." (*Melendez-Diaz*, *supra*, 557 U.S. at p. 324.)

Applying those concepts to the chain of custody logsheet, it is clear that several of the notations are nontestimonial. Entries of the lab number assigned to each sample and the dates on which the sample was received and tested are made "for the administration of an entity's affairs." (*Melendez-Diaz*, *supra,* 557 U.S. at p. 324.) The laboratory could not conduct its business were it unable to identify samples and track them through the course of their processing. Records of routine tracking and foundational information are kept by the business to facilitate its ongoing organization and operation.

Some notations in business records may ultimately prove relevant at a trial. But their mere relevance does not make them testimonial. Any number of

---

*(Footnote continued from previous page.)*

application of the *Palmer* distinction, focusing on *why* a document was produced, foreshadowed the "primary purpose" analysis later employed in Sixth Amendment confrontation cases.

nontestimonial statements, made in a variety of contexts, may ultimately become relevant in a case. Indeed, were a statement irrelevant it would be inadmissible regardless of any Sixth Amendment bar.

Admission of a relevant business record does not violate the confrontation clause unless its contents qualify as a testimonial statement. The Supreme Court cases counsel that it is the formality of the statement and the primary purpose for which it was made that resolve that question. A notation made for the primary purpose of "the administration of an entity's affairs" (*Melendez-Diaz, supra*, 557 U.S. at p. 324) is not testimonial.

Other entries on the chain of custody logsheet are arguably more testimonial in character, specifically the notation that the sample was received in a sealed condition and the recordation of the specific blood-alcohol level of defendant's sample. These records are, arguably, created for later use at trial. If the notation of the sealed condition had been excluded, the prosecution would not have been able to establish that fact. However, such an omission would have gone to the weight of the evidence, not its admissibility. The expert witness would still have been able to lay sufficient foundation for the machine-generated graph and explain its significance. The sealed condition of the sample was never disputed. On the facts of this case, the admission of the sealed-condition notation was harmless.

The entry reflecting that defendant's sample produced a blood-alcohol result of 0.09 percent also appears to be a record for later use at trial. However, as the majority points out, the printout produced by the gas chromatograph machine, which was not hearsay, was properly admitted and explained by the expert testimony of criminalist Willey, who was available for cross-examination. Thus, admission of that portion of the record was also harmless.

The general rule articulated in *Crawford, supra,* 541 U.S. 36, remains operative. A hearsay statement that otherwise satisfies a statutory exception may be admitted against a criminal defendant without violating the confrontation clause as long as the statement is not "testimonial." Drawing on the Supreme Court's discussions in *Crawford* and *Melendez-Diaz,* we may safely conclude that some statements in business records may be admitted in a criminal trial if they are made primarily "for the administration of an entity's affairs" rather than "proving some fact at trial." (*Melendez-Diaz, supra*, 557 U.S. at p. 324.) Courts must take care in honoring that distinction. A particular statement made in a document that might otherwise qualify as a business record may still be testimonial and therefore barred by the confrontation clause. But if a hearsay statement is nontestimonial, its admission does not implicate the Sixth Amendment's confrontation requirement.

**CORRIGAN, J.**

**WE CONCUR:**

**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**

**DISSENTING OPINION BY LIU, J.**

The nine separate opinions offered by this court in the three confrontation clause cases decided today reflect the muddled state of current doctrine concerning the Sixth Amendment right of criminal defendants to confront the state's witnesses against them. The United States Supreme Court's most recent decision in this area produced no authoritative guidance beyond the result reached on the particular facts of that case. (See *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221] (*Williams*).) Given the array of possible doctrinal approaches left open by *Williams*, one can only surmise that the high court will soon weigh in again.

In the meantime, it is incumbent upon this court to analyze *Williams* together with precedents that remain binding on us to identify, as best as we can, the governing principles in this evolving area of law. In discharging that obligation, today's opinion articulates a two-part definition of testimonial hearsay. "First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity." (Maj. opn., *ante*, at p. 13.) "Second, all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution . . . ." (*Id.* at p. 14.) These statements are true as far as they go. But they offer little guidance to lower courts and litigants who must confront these issues day in and day out.

1

In this case, the court rests its holding on the sole ground that the out-of-court statements at issue lacked sufficient indicia of formality to trigger defendant's confrontation clause right. But the Supreme Court has never relied *solely* on a statement's lack of formality to deny a defendant's right to confront witnesses against him. Although the court today succeeds in reaching a majority holding, its reasoning does little to help clarify this difficult area of law.

The high court's precedents offer us more than this. A careful reading of the case law, beginning with *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), suggests that the level of formality of a statement, while relevant, does not exhaust the proper analysis for adjudicating a claim under the confrontation clause. In this case, I would conclude that the laboratory analyst's out-of-court statements concerning the source and conduct of blood-alcohol testing qualify as testimonial under the Sixth Amendment based on the *process* and *purpose* that gave rise to those statements. Because the statements were offered through the testimony of a surrogate analyst without personal knowledge of the underlying facts, defendant was denied her right to confront the state's witnesses against her.

## I.

As an initial matter, I address the proper interpretation of the high court's decision in *Williams*. " 'When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds . . . ." ' (*Marks v. U.S.* (1977) 430 U.S. 188, 193.)" (*Del Monte v. Wilson* (1992) 1 Cal.4th 1009, 1023.) As the Ninth Circuit has explained, "We need not find a legal opinion which a majority joined, but merely 'a legal standard which, when applied, will necessarily produce results with which a majority of the Court from that case would agree.' " (*U.S. v.*

2

*Williams* (9th Cir. 2006) 435 F.3d 1148, 1157.) "This rule only works in instances where 'one opinion can meaningfully be regarded as "narrower" than another — only when one opinion is a logical subset of other, broader opinions,' [*King v. Palmer* (D.C. Cir. 1991) 950 F.2d 771, 781 (en banc)], that is to say, only when that narrow opinion is the common denominator representing the position approved by at least five justices. When it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court." (*U.S. v. Alcan Aluminum Corp.* (2d Cir. 2003) 315 F.3d 179, 189 (*Alcan*).) "The only binding aspect of such a splintered decision is its specific result . . . ." (*Ibid.*)

No published lower court decision, state or federal, that has examined *Williams* has identified a single standard or common denominator commanding the support of a five-justice majority. I, too, conclude that *Williams* is an example of a decision where the only binding aspect is its specific result. (See *State v. Deadwiller* (Wis.Ct.App. 2012) 820 N.W.2d 149, 153 ["We are bound in this case by the *judgment* in *Williams,* and the narrowest holding agreed-to by a majority (albeit with different rationales) is that the Illinois DNA technician's reliance on the outside laboratory's report did not violate Williams's right to confrontation because the report was not 'testimonial' and therefore did not implicate the Confrontation Clause."].)

Writing for a four-justice plurality, Justice Alito found that the witness's testimony about Cellmark's out-of-court statements concerning the source of the DNA sample and the lab's methodology were offered not for their truth but rather to explain the assumptions upon which the prosecution expert's opinion rested. (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).) Justice Thomas and the four dissenting justices rejected this argument. (See *id.* at

3

p. ___ [132 S.Ct. at p. 2256] (conc. opn. of Thomas, J.) ["there was no plausible reason for the introduction of Cellmark's statements other than to establish their truth"]; *id.* at p. ___ [132 S.Ct. at p. 2268] (dis. opn. of Kagan, J.).) The plurality also reasoned that the statements were not testimonial because they were not made with "the primary purpose of accusing a targeted individual of engaging in criminal conduct." (*Id.* at p. ___ [132 S.Ct. at p. 2242] (plur. opn. of Alito, J.).) This rationale was also rejected by the other five justices. (*Id.* at p. ___ [132 S.Ct. at p. 2262] (conc. opn. of Thomas, J.) ["[The plurality's] test lacks any grounding in constitutional text, in history, or in logic."]); *id.* at p. ___ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.) ["Where that test comes from is anyone's guess."].) As Justice Kagan observed, Justice Alito's opinion is called " 'the plurality,' because that is the conventional term for it. But in all except its disposition, his opinion is a dissent:  Five Justices specifically reject every aspect of its reasoning and every paragraph of its explication." (*Id.* at p. ___ [132 S.Ct. at p. 2265] (dis. opn. of Kagan, J.).)

Justice Thomas concurred only in the result reached by the plurality, adhering to his long-held view that the "Confrontation Clause regulates only the use of statements bearing 'indicia of solemnity.' " (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2259] (conc. opn. of Thomas, J.).) By that test alone, Justice Thomas concluded that Cellmark's report was not testimonial because it "lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact." (*Id.* at p. ___ [132 S.Ct. at p. 2260].) Although this sharp focus on the formality of the statement might suggest that it is the narrowest ground on which the *Williams* decision rests, that is not the case. The plurality opinion observed that "formalized statements such as affidavits, depositions, prior testimony, or confessions" were among the characteristics shared by the abuses which prompted the adoption of the confrontation clause. (*Id.* at p. ___ [132 S.Ct.

4

at p. 2242].)  But the plurality did not otherwise examine or rely on the degree of formality of the statements at issue.  Thus, Justice Thomas's opinion cannot be "meaningfully regarded as 'narrower' than" the plurality opinion because it is not a "logical subset" of the plurality opinion.  (*King v. Palmer*, *supra*, 950 F.2d at p. 781.)

It is a mistake to contend, as Justice Chin does in his concurring opinion today in *People v. Dungo* (Oct. 15, 2012, S176886) ___ Cal.4th ___ [pp. 1–3] (conc. opn. of Chin, J.), that we should resolve confrontation clause cases by determining what result would garner the votes of the five justices who supported the outcome in *Williams*.  That approach — cobbling together the nonoverlapping rationales put forward by Justice Alito and Justice Thomas in *Williams* — does not identify "a single standard" or "common denominator" on which five justices of the high court agree.  (*Alcan*, *supra*, 315 F.3d at p. 189.)

Likewise, the court in this case errs in rejecting defendant's reliance on Justice Kagan's opinion in *Williams* simply because it is labeled a dissent.  (Maj. opn., *ante*, at p. 18.)  As with the labeling of Justice Alito's opinion as "the plurality," Justice Kagan's opinion is labeled a "dissent" only by convention.  The fact that Justice Alito's and Justice Thomas's opinions support the result in *Williams* does not mean that Justice Kagan's opinion is a dead letter in this area of doctrine.  In the future, Justice Thomas's and Justice Kagan's positions might result in a five-justice majority for a particular result, as in cases like *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*) and *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705] (*Bullcoming*), where the out-of-court statement was sufficiently formal to meet Justice Thomas's standard and the primary purpose was evidentiary.  Likewise, Justice Alito's and Justice Kagan's positions might result in a majority for a particular result in cases where the evidence does not meet Justice Thomas's standard of formality but is

5

otherwise sufficiently formal and accusatory to be considered testimonial under Justice Alito's standard. In such a case, *Marks* analysis might make Justice Alito's standard binding as to that category of cases. (See *Marks v. United States*, *supra*, 430 U.S. 188.) But that result would still leave open the proper standard for cases where the contested statement does not satisfy Justice Alito's standard but does satisfy Justice Kagan's.

As this discussion illustrates, it is easy enough to count noses and determine what the outcome would be if we were to apply the various opinions in *Williams* to alternative fact patterns. But such nose-counting is a job for litigators, not jurists. As a court tasked with applying an evolving line of jurisprudence, our role is not simply to determine what outcome will likely garner five votes on the high court. Our job is to render the best interpretation of the law in light of the legal text and authorities binding on us.

**II.**

Turning to the case at hand, I agree with the court's basic conclusion that the United States Supreme Court's approach to distinguishing testimonial from nontestimonial statements for purposes of the confrontation clause has something to do with formality and something to do with whether the statement's primary purpose relates to a criminal prosecution. (Maj. opn., *ante*, at pp. 13–14.) But the court rests its holding on a single factor — the lack of formality with which the out-of-court statement was memorialized — that the high court has never held to be dispositive despite numerous entreaties by Justice Thomas to his colleagues over the past two decades. (See *White v. Illinois* (1992) 502 U.S. 346, 365 (conc. & dis. opn. of Thomas, J.); *Davis v. Washington* (2006) 547 U.S. 813, 836–837 (conc. & dis. opn. of Thomas, J.) (*Davis*); *Michigan v. Bryant* (2011) 562 U.S. ___ [131 S.Ct. 1143, 1167–1168] (conc. opn. of Thomas, J.) (*Bryant*); *Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2255] (conc. opn. of Thomas, J.).) Although

formality can bring a statement or document into the " 'core class of testimonial statements' " covered by the confrontation clause (*Melendez-Diaz*, *supra*, 557 U.S. at p. 310), no high court decision has found that lack of formality is alone sufficient to render a statement nontestimonial. The cases routinely consider the context in which the statement was made and the purpose for which it was rendered.

The high court's decisions have not made clear how much formality is required to render a statement testimonial. Justice Thomas, who cast the swing vote in *Williams*, has focused on the ultimate format of the statement (e.g., notarized, certified, sworn, etc.) rather than the forum or process through which it was generated. (But see *Davis*, *supra*, 547 U.S. at pp. 836–837 (conc. & dis. opn. of Thomas, J.) ["Affidavits, depositions, and prior testimony are, by their very nature, taken through a formalized process."].) But a careful reading of the Supreme Court's decisions suggests that the proper determination of a statement's formality for purposes of the confrontation clause is closely intertwined with the nature and purpose of the process that produced the statement.

As Justice Scalia has explained, "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused. It was these practices that the Crown deployed in notorious treason cases like Raleigh's; that the Marian statutes invited; that English law's assertion of a right to confrontation was meant to prohibit; and that the founding-era rhetoric decried. The Sixth Amendment must be interpreted with this focus in mind." (*Crawford*, *supra*, 541 U.S. at p. 50.) From this statement, we see an emphasis not on the format of the statement, but on the process through which it was generated — ex parte examinations by the state outside of the defendant's presence.

7

*Crawford* went on to say that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement." (*Crawford*, *supra*, 541 U.S. at p. 51.) While this reference to a "type" of statement could be read to pertain to the statement's *format*, the high court paid special attention to *processes* driven by government officers: "That interrogators [today] are police officers rather than magistrates does not change the picture either. Justices of the peace conducting examinations under the Marian statutes were not magistrates as we understand that office today, but had an essentially investigative and prosecutorial function. . . . The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace." (*Id.* at p. 53.) *Crawford* explained that focusing on government involvement in the production of evidence serves as a check on prosecutorial abuse. (*Id.* at p. 56, fn. 7 ["Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse — a fact borne out time and again throughout a history with which the Framers were keenly familiar."].)

The importance of process to the determination of a statement's formality is perhaps most apparent from the reasoning and results in *Davis*. There, the high court said: "Most of the American cases applying the Confrontation Clause or its state constitutional or common-law counterparts involved testimonial statements of the most formal sort — sworn testimony in prior judicial proceedings or formal depositions under oath — which invites the argument that the scope of the Clause is limited to that very formal category. But the English cases that were the progenitors of the Confrontation Clause did not limit the exclusionary rule to prior

8

court testimony and formal depositions, [citation]. In any event, we do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman *recite* the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition. Indeed, if there is one point for which no case — English or early American, state or federal — can be cited, that is it." (*Davis*, *supra*, 547 U.S. at pp. 825–826.)

In *Davis*, the high court resolved two cases, each involving a contested out-of-court statement. One was a 911 call made by a woman reporting an ongoing assault. In response to questions from the 911 operator, the woman made a series of statements that were recorded and later played for the jury. (*Davis*, *supra*, 547 U.S. at pp. 817–819.) Because the recording of the 911 call was admitted into evidence, it seems fair to assume that the prosecution established some foundation for doing so, including an attestation that the recording was accurate and involved the incident in question. But the high court made no mention of any formalities in how the 911 call was memorialized. Instead, the court compared the 911 call with the out-of-court statements at issue in *Crawford* and observed that "the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; [here, the defendant's] frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." (*Davis*, at p. 827.) The high court took note of this relative lack of formality in the context of a broader discussion establishing that "the elicited statements [in the 911 call] were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." (*Davis*, at p. 827.) These contextual considerations led the high court to conclude that the "primary purpose" of eliciting the statements on the 911 call "was to enable police

9

assistance to meet an ongoing emergency. [The declarant] simply was not acting as a *witness*; she was not *testifying*." (*Id.* at p. 828.)

The other out-of-court statement considered in *Davis* was a police interview conducted with a battery victim in her home after officers responded to a "reported domestic disturbance." (*Davis*, *supra*, 547 U.S. at pp. 819–820.) The substance of the police interview was recounted through the testimony of one of the responding officers. (*Id.* at p. 820.) Although the declarant's oral statements were not recorded, sworn, or attested to in any formal manner, the high court found the circumstances in which the statements were given to be sufficiently formal to qualify as testimonial: "It is true that the *Crawford* interrogation was more formal. It followed a *Miranda* warning, was tape-recorded, and took place at the station house, [citation]. While these features certainly strengthened the statements' testimonial aspect — made it more objectively apparent, that is, that the purpose of the exercise was to nail down the truth about past criminal events — none was essential to the point. It was formal enough that [the declarant's] interrogation was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his 'investigat[ion].' [Citation.] What we called the 'striking resemblance' of the *Crawford* statement to civil-law *ex parte* examinations, [citation], is shared by [the declarant's] statement here. Both declarants were actively separated from the defendant . . . . Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." (*Davis*, at p. 830.) As these passages from *Davis* make clear, the

10

high court focused on the process by which an out-of-court statement was generated, not the ultimate format of the resulting statement.

We applied *Davis* in *People v. Cage* (2007) 40 Cal.4th 965 (*Cage*) to find that an unsworn statement given to police by an assault victim awaiting treatment in an emergency qualified as testimonial. Regarding the statement's formality, we observed: "The circumstances of this interview, in a hospital emergency room, were relatively informal, but they were no less formal or structured than the residential interview of [the declarant] in *Davis*. Here, as there, the requisite solemnity was imparted by the potentially criminal consequences of lying to a peace officer." (*Cage*, at p. 986, fn. omitted.) Nor was the interview in *Cage* "insufficiently 'structured' to constitute an 'interrogation' " simply because the record mentioned only a single question posed by the officer to the victim. (*Id.* at p. 986, fn. 16.) Instead, we observed that "single question . . . called for, and elicited, a considered and detailed narrative response" analogous to the statement in *Davis*. (*Cage*, at p. 986, fn. 16.) The fact that the statement was neither taperecorded nor memorialized as an affidavit or other sworn statement did not negate the formality imparted by the circumstances in which it was rendered.

Four years later, in *Bryant*, the high court again made clear that lack of formality is not dispositive of whether a statement is testimonial. "Formality is not the sole touchstone of our primary purpose inquiry because, although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to 'establish or prove past events potentially relevant to later criminal prosecution,' [citation] informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." (*Bryant*, *supra*, 562 U.S. at p. ___ [131 S.Ct. at p. 1160].) Although the out-of-court statement at issue in *Bryant* was not memorialized or recorded in any formal way, the high court's analysis did not focus on those features. Instead, it focused on the

11

"informality of the circumstances" in which the statement was made to find that it was not testimonial: "[T]he questioning in this case occurred in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion. All of those facts make this case distinguishable from the formal station-house interrogation in *Crawford*." (*Bryant*, at p. ___ [131 S.Ct. at p. 1160].)

The court today rests its holding solely on the lack of formality with which the statement was memorialized, without regard to the process by which it was created. In so doing, the court takes a step down the road of making constitutional mountains out of factual molehills in a manner that Justice Kagan warned against. (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2276] (dis. opn. of Kagan, J.) [focusing on the ultimate format of a lab report "grants constitutional significance to minutia, in a way that can only undermine the Confrontation Clause's protections"].) Had the analyst's notations here been preceded by the formal heading of "certificate," or had his signature followed a printed statement that he "attested" to the results, the court would presumably find his report to be testimonial. And that would be correct insofar as such notations would suggest that the document was generated through a process that was primarily concerned with its later use in a criminal prosecution. However, as in *Davis* and *Cage*, the absence of such notations tells us nothing definitive about the formality with which the statements were generated. (See *Williams*, at p. ___ [132 S.Ct. at p. 2276] (dis. opn. of Kagan, J.) ["[A] difference in labeling . . . is not of constitutional dimension."].) Instead, we must look at the process that produced the statements, "taking into account all of the surrounding circumstances" (*id.* at p. ___ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.)) in order to discern not only the statements' "form" but also their "function" and "purpose" (*id.* at p. ___ [132 S.Ct. at p. 2276] (dis. opn. of Kagan, J.)).

12

Here, the San Diego County Sheriff's Regional Crime Laboratory, a state-licensed forensic alcohol laboratory under the control of the San Diego Sheriff's office, received a blood sample from the California Highway Patrol for testing. A laboratory assistant, Brian Constantino, prepared the sample for testing. In handwriting on an evidence log sheet, Constantino assigned a lab number to the sample, noted whether or not the sample was sealed upon receipt, and wrote other identifying information about the sample, including the subject's name, date of birth, requesting agency, the arresting officer's badge number, type of specimen, date and time of collection, and the type of analysis requested. Later that week, a second analyst, Jorge Peña, prepared the sample and conducted a blood-alcohol analysis by means of a gas chromatograph. When the machine completed its analysis, Peña reviewed and initialed the machine printouts of the results. On the original log sheet, Peña recorded the results of the blood-alcohol analysis performed on the sample, the date of the analysis, and his initials as the person performing the requested analysis.

At trial, the prosecution introduced the evidence log sheet along with five additional pages containing computer printouts with the results of machine calibration conducted by Peña and the results of the analysis Peña performed on the sample. Each of those five pages was signed or initialed by Peña, but otherwise includes no independent statements or attestations by Peña as to the results. All six pages were introduced through the testimony of John Willey, a forensic alcohol supervisor employed by the same lab that conducted the analysis. Willey testified that his title of "forensic alcohol supervisor" was "issued to me by the state of California" along with a certification for that role. (See Cal. Code Regs., tit. 17, §§ 1215.1, subd. (f) [defining "Forensic Alcohol Supervisor"], 1216.1, subd. (e) [setting forth qualifications for a "forensic alcohol supervisor"].) Willey also testified that "each of the people who works at the lab is trained to

13

process blood alcohol analysis in the same manner" based on standards that were originally established by the state and are now dictated by the Sheriff's crime lab itself in accordance with scientific standards.

I focus here on the evidence log sheet, a single page containing notations by Constantino and Peña. The document, marked "FOR LAB USE ONLY," may look relatively informal. But the context in which it was created was anything but. As Willey testified, the laboratory staff are all trained to analyze blood alcohol "in the same manner" based on standards set by the state and by the lab. He further testified that those procedures are followed in every case. Of course, this type of careful adherence to formal procedures is good practice for the accuracy and validity of the work of any laboratory. But this was a *government crime lab*, and the notations on the log sheet were produced with at least as much solemnity and government involvement as the structured, tape-recorded, station-house witness interview in *Crawford*.

Indeed, the highly proceduralized, government-driven character of the blood-alcohol analysis is apparent from the array of regulations governing the licensing of forensic alcohol laboratories by the State Department of Health Services (Department), as well as analyst qualifications, testing procedures, and record-keeping. (See Cal. Code Regs., tit. 17, §§ 1216 [imposing licensing requirement], 1216.1 [setting forth licensing qualifications], 1216.1, subd. (f) [defining qualifications for a "forensic alcohol analyst"], 1217.7 [authorizing Department to conduct on-site surveys and proficiency tests to ensure accuracy of forensic alcohol analyses], 1219 ["The identity and integrity of the samples shall be maintained through collection to analysis and reporting."], 1220 [requiring each licensed lab to "have on file with the Department detailed, up-to-date written descriptions of each method it uses for forensic alcohol analysis"], 1222.1 [imposing record-keeping requirements].) Further, just as the witness statements

14

in *Davis* and *Cage* were made under the potential threat of legal sanction for lying to a peace officer, erroneous notations on the log sheet — whether due to inadvertence, incompetence, or willful fabrication — can, at a minimum, cause the crime lab to lose its license or face "disciplinary action" by the Department. (Cal. Code Regs., tit. 17, § 1216.1, subd. (c).) In addition, an analyst who knowingly makes erroneous notations may be subject to criminal sanction. (See, e.g., Pen. Code, §§ 133 [prohibiting fraud, deceit, or knowingly false statements with intent to affect a witness's testimony], 134 [prohibiting preparation of false documentary evidence], 137 [making it a crime to influence testimony or information given to a law enforcement officer].) In light of these considerations, I conclude that the notations on the log sheet were produced with the kind of government involvement and formality of process that implicate the right protected by the confrontation clause.

## III.

I now turn to the second factor in confrontation clause analysis: the primary purpose of the document. As the court observes, "all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement's primary purpose must be." (Maj. opn., *ante*, at p. 14.) According to the plurality in *Williams*, a testimonial statement is one that has "the primary purpose of accusing a targeted individual of engaging in criminal conduct." (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2242] (plur. opn. of Alito, J.).) Five justices in *Williams* rejected the plurality's rule on the ground that it "derives neither from the text nor from the history of the Confrontation Clause" and "has no basis in our precedents." (*Id.* at p. ___ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.); see *id.* at p. ___ [132 S.Ct. at p. 2262] (conc. opn. of Thomas, J.).) Justice Thomas said that "for a statement to be testimonial within the

15

meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution." (*Id.* at p. ___ [132 S.Ct. at p. 2261] (conc. opn. of Thomas, J.).) The four dissenting justices proposed a similar rule, relying on *Melendez-Diaz*: A statement is testimonial when "made for the primary purpose of establishing 'past events potentially relevant to later criminal prosecution' — in other words, for the purpose of providing evidence." (*Id.* at p. ___ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.).)

A review of the case law indicates that Justice Kagan's "evidentiary" primary purpose test is most faithful to the high court's authoritative pronouncements in prior cases going back to *Crawford*. In *Davis*, *supra*, 547 U.S. at page 822, the high court said that statements in response to police interrogation "are testimonial when the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." In *Bullcoming*, *supra*, 564 U.S. at page ___ [131 S.Ct. at p. 2717], the high court said that "[a] document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." The same idea is stated in *Bryant*, *supra*, 562 U.S. at page ___ [131 S.Ct. at p. 1157] ("The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution.' "), in *Melendez–Diaz*, *supra*, 557 U.S. at pages 310–311 (statements " ' "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" ' " were testimonial), and in *Crawford*, *supra*, 541 U.S. at pages 51–52 ("[v]arious formulations of this core class of 'testimonial' statements exist," including " 'statements that were made under circumstances which would

16

lead an objective witness reasonably to believe that the statement would be available for use at a later trial' ").

Unlike the *Williams* plurality's "accusatory" or "inherently inculpatory" test, Justice Kagan's evidentiary test is also consistent with the text and history of the Sixth Amendment, which guarantees to criminal defendants the right "to be confronted with the witnesses against him." As the court explained in *Melendez-Diaz*, "The text of the [Sixth] Amendment contemplates two classes of witnesses — those against the defendant and those in his favor. . . . [T]here is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation." (*Melendez-Diaz*, *supra*, 557 U.S. at pp. 313–314.) Responding to the plurality in *Williams*, Justice Thomas concluded that "the distinction between those who make 'inherently inculpatory' statements and those who make other statements that are merely 'helpful to the prosecution' has no foundation in the text of the Amendment." (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2263] (conc. opn. of Thomas, J.).) Justice Thomas further noted that the 17th- and 18th-century English law that gave rise to the confrontation clause required magistrates "to take the *ex parte* examination of a witness even if his evidence was 'weak' or the witness was 'unable to inform any material thing against' an accused." (*Ibid.*; see also *Crawford*, *supra*, 541 U.S. at pp. 42–50 [discussing the abusive historical practices that resulted in adoption of the confrontation clause].)

While generally agreeing with the "evidentiary" primary purpose test (see *People v. Dungo*, *supra*, __ Cal.4th ___ [p. 17] (diss. opn. of Corrigan, J.)), Justice Corrigan concludes in this case that several of the notations are nontestimonial because they "were simple, nontestimonial business records." (Conc. opn. of Corrigan, J., *ante*, at p. 2.) But in *Melendez-Diaz*, the high court rejected the argument that the analysts' affidavits in that case were admissible at common law as business records without regard to the confrontation clause: "[T]he affidavits

17

do not qualify as traditional official or business records, and *even if they did, their authors would be subject to confrontation nonetheless*." (*Melendez-Diaz, supra,* 557 U.S. at p. 321, italics added.) While acknowledging that "[d]ocuments kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status," the high court said "that is not the case if the regularly conducted business activity is the production of evidence for use at trial." (*Ibid.*) Justice Corrigan is correct that "[t]his sentence should not be read to mean that if the nature of the business is producing forensic evidence, as in the case of a testing laboratory, none of its records can ever qualify as a business record." (Conc. opn. of Corrigan, J., *ante*, at p. 2, fn. 2.) Certainly those records maintained by a crime lab solely for the purpose of its internal operations, such as payroll and accounting records, would qualify as nontestimonial business records. A gray area might be presented by lab records maintained solely for purposes of accreditation and licensing (see Cal. Code Regs., tit. 17, § 1222.1), given the state's obvious interest in the proper operation of forensic labs. But the same cannot be said of records generated in the course of evidence analysis. The record in this case shows that the lab's evidentiary purpose permeates even the most mundane of activities associated with the tested samples.

As noted, the San Diego crime lab follows strict procedures established internally by the sheriff's office and by state regulatory law. The active involvement of law enforcement is evident on the face of the log sheet, which contains entries for the requesting agency (here, the California Highway Patrol) and the name and badge number of the subject's arresting officer. Moreover, in his testimony, Willey specifically mentioned the evidentiary value of the lab's work in criminal prosecutions as a factor guiding the processes followed by the lab. When asked about the lab's procedures for handling samples and assigning lab numbers, Willey explained: "When the — when the bag is opened and the

18

numbers are put on it, a sample is picked that's the best of the two for analysis. We only analyze one sample for everything. That way, it's — we don't get into the defense problem that we analyzed one sample and the other one, we analyzed for something else. So everything goes on one sample." Willey further explained: "Years ago, there was a lot of argument. We would get two samples in. We would send one to toxicology, and we analyzed one for alcohol. Turned out we got a lot of defense arguments, how do we know what was done? How do we know the samples are the same? At that point, the policy and procedure was changed. We keep a duplicate vial in case anything comes up that we need more testing. And we do all of our analysis on one vial."

Based on Willey's testimony, it is apparent that from the moment an evidence bag is opened and the analyst selects a vial for testing by assigning it a lab number and recording the number onto the log sheet, the lab's procedures are driven by potential use of the results as evidence in a criminal prosecution. Thus, the records at issue here, including the analyst's notations linking defendant to the lab record in question, are testimonial. (See *Melendez-Diaz*, *supra*, 557 U.S. at p. 324 ["Whether or not they qualify as business or official records, the analysts' statements here — prepared specifically for use at petitioner's trial — were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment."].) Because the statements were introduced through a surrogate with no personal knowledge of those facts, they were offered in violation of the confrontation clause.

Importantly, the conclusion I reach in this case does not raise the specter of "requir[ing] in-court testimony from each human link in the chain of custody." (*Melendez-Diaz*, *supra*, 557 U.S. at p. 336 (dis. opn. of Kennedy, J.).) Like the high court in *Melendez-Diaz*, I would "not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity

19

of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." (*Id.* at p. 311, fn. 1 (maj. opn.).) This is a case about a county crime lab. A crime lab, where a high volume of samples are received, stored, and tested, presents particular risks of mix-up or contamination that may not extend to chain of custody issues in other settings. (See *id.* at pp. 317–321; Metzger, *Cheating the Constitution* (2006) 59 Vand. L.Rev. 475, 494–495 [recounting systemic problems with crime labs in Maryland, Arizona, Texas, and Florida].)

Justice Werdegar's desire to establish "fair and practical" boundaries around the confrontation clause is both understandable and salutary. (Conc. opn. of Werdegar, J., *ante*, at p. 2.) The difficulty, however, is that the arguments in her concurring opinion as to why the notations on the log sheet should not be deemed testimonial have been considered and rejected by the high court. First, Justice Werdegar contends that "the recording of an identifying notation, even in a county crime laboratory, raises none of the risk of fabrication or biased reporting that flows from police or prosecutorial interrogation . . . ." (*Id.* at p. 2.) But the high court in *Melendez-Diaz* declined to exempt "neutral scientific testing" from the reach of the confrontation clause on the ground that such testing is not "as neutral or as reliable" as the state suggested. (*Melendez-Diaz*, *supra*, 557 U.S. at p. 318.) Citing a National Academy of Sciences study, the high court observed that " '[t]he majority of [laboratories producing forensic evidence] are administered by law enforcement agencies, such as police departments, where the laboratory administrator reports to the head of the agency.' [Citation.] And '[b]ecause forensic scientists often are driven in their work by a need to answer a particular question related to the issues of a particular case, they sometimes face pressure to sacrifice appropriate methodology for the sake of expediency.' [Citation.] A forensic analyst responding to a request from a law enforcement

20

official may feel pressure — or have an incentive — to alter the evidence in a manner favorable to the prosecution." (*Ibid.*) As noted, the crime lab in this case is part of the San Diego County Sheriff's Department. (See San Diego County Sheriff's Department, Regional Crime Laboratory, available online at <http://www.sdsheriff.net/crimelab.html> [as of Oct. 15, 2012].) What the high court said about the test results from the state drug lab in *Melendez-Diaz* is equally applicable to the notations on the log sheet from the county crime lab here: "Forensic evidence is not uniquely immune from the risk of manipulation." (*Melendez-Diaz*, at p. 318.)

Second, Justice Werdegar says there is no reason "to assume any greater risk of inadvertent error is present in a county crime laboratory than in other businesses or public offices." (Conc. opn. of Werdegar, J., *ante*, at p. 2.) But the high court in *Melendez-Diaz*, noting that "[s]erious deficiencies have been found in the forensic evidence used in criminal trials," made clear that "[c]onfrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." (*Melendez-Diaz*, *supra*, 557 U.S. at p. 319.) Such incompetence (or fraudulent conduct) may extend not only to the conduct of a particular test and the reporting of its result, but also to the verification of a sample's identity and integrity. Indeed, the high court in *Bullcoming* specifically noted that the nontestifying analyst in that case "certified that he received Bullcoming's blood sample intact with the seal unbroken" and "that he checked to make sure that the forensic report number and the sample number 'correspond[ed].' " (*Bullcoming*, *supra*, 564 U.S. ___ [131 S.Ct. at p. 2714].) These representations, which conveyed information similar to the notations on the log sheet here, were among the statements the high court deemed testimonial and "meet for cross-examination." (*Ibid.*)

Third, Justice Werdegar says "[n]or is much likely to be gained by requiring that in all cases the employee who records a laboratory identification number be called to the stand. Such an employee presumably make scores or hundreds of such notations annually and is extremely unlikely to recall any particular one." (Conc. opn. of Werdegar, J., *ante*, at p. 3.) But the same could have been said about the analysts who prepared the reports at issue in *Melendez-Diaz* and *Bullcoming*. The high court in *Melendez-Diaz* rejected the suggestion that "cross-examination of the analysts would be an empty formalism," noting that "an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination" and that "there is little reason to believe that confrontation will be useless in testing analysts' honesty, proficiency, and methodology — the features that are commonly the focus in the cross-examination of experts." (*Melendez-Diaz*, *supra*, 557 U.S. at pp. 319, fn. 6, 320, 321.) Similarly, in *Bullcoming*, the high court concluded that the analyst's "live testimony could hardly be typed 'a hollow formality,' " observing that "surrogate testimony . . . could not convey what [the analyst] knew or observed about the events his certification concerned" or "expose any lapses or lies on the certifying analyst's part." (*Bullcoming*, *supra*, 564 U.S. ___ [131 S.Ct. at pp. 2715–2716].) Moreover, apart from whether an analyst can provide useful testimony about a particular sample, "the prospect of confrontation will deter fraudulent analysis in the first place." (*Melenda-Diaz*, at p. 319.)

More fundamentally, whatever plausibility there may be to the contention that "[n]o significant benefit appears that would justify the expense of trial and witness time involved in requiring live witnesses on all such identifying notations" (conc. opn. of Werdegar, J., *ante*, at p. 3), the high court has made clear that whether or not in-court testimony would produce an incremental gain to reliability is not the proper inquiry here. It is no answer to a confrontation clause claim to

22

say that a laboratory's standard procedures indicate the trustworthiness of the results or notations. As the high court explained in *Crawford* and repeated in *Melendez-Diaz* and *Bullcoming*: "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. . . . [¶] . . . [¶] Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." (*Crawford*, *supra*, 541 U.S. at pp. 61–62; see *Melendez-Diaz*, *supra*, 557 U.S. at pp. 317–318; *Bullcoming*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2715].) To underscore the point, the high court in *Melendez-Diaz* said the analysts were subject to confrontation even "if all analysts always possessed the scientific acumen of Mme. Curie and the veracity of Mother Teresa." (*Melendez-Diaz*, at p. 319, fn. 6; see *Bullcoming*, 564 U.S. at p. ___ [131 S.Ct. at p. 2715].) Until the high court arrives at an authoritative decision that instructs otherwise, we are bound by the controlling rationale of its established precedents. Those precedents specifically reject alternative guarantees of reliability as proxies for the constitutional right in question. "There [may be] other ways — and in some cases better ways — to challenge or verify the results of a forensic test. But the Constitution guarantees one way: confrontation." (*Melendez-Diaz*, at p. 318.)

## IV.

The judgment must be reversed unless the prosecution can show beyond a reasonable doubt that the result would have been the same notwithstanding the error. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Applying that test here, I conclude that introduction of the evidence log sheet linking defendant to the test sample was prejudicial.

23

Defendant was charged with vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b)), a crime that occurs upon commission of vehicular manslaughter while "driving . . . in violation of Section 23140, 23152, or 23153 of the Vehicle Code . . . ." The prosecutor may prove intoxication by one of two means: proof that the defendant's blood-alcohol level was 0.08 percent or greater at the time of the accident (see Veh. Code, § 23152, subd. (b); *id.*, § 23153, subd. (b)) or proof that the defendant was unable to "drive . . . with the caution of a sober person, using ordinary prudence under same or similar circumstances" because of the effects of alcohol (CALCRIM No. 2110). In this case, the prosecution argued both. However, the lab results showing that defendant's blood-alcohol level was 0.09 percent two hours after the accident were critically important to the prosecution. Based entirely upon that test result, prosecution toxicologist John Treuting testified that defendant's blood-alcohol level was actually 0.12 percent at the time of the accident. Without that test result, Treuting would have concluded that defendant's blood-alcohol level was "far lower" based on testimony for the prosecution that she consumed only three shots of tequila. Defendant and defense witnesses testified that she had consumed only two shots of tequila.

Willey purported to offer his own independent analysis of the gas chromatography results. But his testimony had no value without the critical link between defendant's blood sample and the test results. Because the log sheet provided the only link between defendant and the lab results, and because the lab results were the critical foundation for the prosecution's evidence that defendant's blood-alcohol level was 0.08 percent or greater at the time of the accident, the error was not harmless.

Because I find admission of the evidence log to be reversible error, I do not need to address any error that may have arisen from Willey's testimony conveying

24

the test results themselves to the jury. I find it doubtful, however, that Willey could have arrived at the 0.09 figure through a truly independent analysis of the gas chromatography results, since the blood-alcohol figure is derived from a complex calculation involving integration and regression. If the 0.09 figure is admissible, it must be because the figure is a computer-generated result that, at least as the law stands today, is generally viewed as nontestimonial. (Maj. opn., *ante*, at pp. 15–16.)

The United States Supreme Court has not decided whether machine-generated results invariably lie beyond the reach of the confrontation clause, and I express no ultimate view on this issue here. I simply note that as a result of ever more powerful technologies, our justice system has increasingly relied on ex part*e* computerized determinations of critical facts in criminal proceedings — determinations once made by human beings. A crime lab's reliance on gas chromatography may be a marked improvement over less accurate or more subjective methods of determining blood-alcohol levels. The allure of such technology is its infallibility, its precision, its incorruptibility. But I wonder if that allure should prompt us to remain alert to constitutional concerns, lest we gradually recreate through machines instead of magistrates the civil law mode of ex parte production of evidence that constituted the "principal evil at which the Confrontation Clause was directed." (*Crawford*, *supra*, 541 U.S. at p. 50.)

I would affirm the judgment of the Court of Appeal.


LIU, J.


25

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Lopez
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 177 Cal.App.4th 202
**Rehearing Granted**

_____

**Opinion No.** S177046
**Date Filed:** October 15, 2012
_____

**Court:** Superior
**County:** San Diego
**Judge:** Lantz Lewis

_____

**Counsel:**

Janice R. Mazur, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Donald E. DeNicola, Deputy State Solicitor General, Gary W. Schons and Julie L. Garland, Assistant Attorneys General, Steven T. Oetting, Daniel Bernstein, Michael Chamberlain, Lynne G. McGinnis and Gil Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

W. Scott Thorpe; and Albert C. Locher, Assistant District Attorney (Sacramento) for California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Dolores A. Carr, District Attorney (San Jose) and John Chase, Deputy District Attorney, for California Association of Crime Laboratory Directors as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Janice R. Mazur
Mazur & Mazur
13465 Camino Canada, No. 106-103
El Cajon, CA  92021
(800) 383-5002

Lynne G. McGinnis
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2205